# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

July 16, 2025

**BY ECF**

The Honorable John G. Koeltl
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:   **United States v. Tabitha Bundrick**
        **24-CR-313 (JGK)**

Dear Judge Koeltl,

      Every night that Tabitha Bundrick laid down on her bare back, opened her legs, and let complete strangers sexually penetrate her body, the only thing that could get her through this terrifying outer body experience was the numbness that she achieved from being high on drugs. This was not the life that Ms. Bundrick sought for herself when she was a young girl growing up in Washinton Heights, New York. Instead, it was a life that she was pimped into as an impressionable teenager with a learning disability that, to this day, has capped her intellectual functioning at a third-grade level.

      While this sentencing focuses on the role that Ms. Bundrick played in sharing her personal use drugs with various men that she slept with as part of her profession, this case presents a tragedy for everyone involved, including Ms. Bundrick herself. For the decedents, their lives have been cut far too short by a dangerous drug that has terrorized New York City. For their families, they have been left with more questions than answers, as they seek to find out who is ultimately responsible for the death of their loved ones. And for Ms. Bundrick, who is not a drug dealer or drug supplier, she is facing over a decade in prison due, in large part, to her own addiction and her need to use drugs to get through the experience of prostituting her body.

      Ms. Bundrick stands before the Court for her first ever criminal conviction. She is not a calculated killer, a cold-hearted manipulator, or someone who lacks a conscience. To the contrary, she is a daughter who has always put others first and who lacks any malice in her heart.[1] She is a

---

[1] *See* Exhibit 1 (Carmen Kelly (Mom) Letter) ("Despite her own struggles, Tabitha has always put others first. That's just who she is. Even when she didn't have much to give, she gave what she could—her time, her love, her attention. Her kindness isn't forced; it's part of her nature. She has no malice in her heart.").

1

sister who her siblings have watched battle to overcome her intellectual shortcomings.[2] And she is a mother who has shown her son that she is more than her worst actions.[3] Ms. Bundrick undoubtedly made a poor decision when she shared her drugs with men who were just "looking for a good time." But she never intended to kill anyone. Indeed, she used the same exact drugs alongside each of them. *See* Dkt. 27 (Presentence Report) at ¶ 35.

For the reasons set forth below, Ms. Bundrick, through undersigned counsel, respectfully asks the Court to impose a sentence of no greater than 10 years. Although the Controlled Substances Act defines Ms. Bundrick's act of sharing her personal use drugs with others as "distribution," the statute was never intended to punish severely such commonplace conduct. Instead, the statute was intended to punish the dealers and suppliers who fed Ms. Bundrick's drug addiction, and who continue to feed her Washington Heights community to this day. Ms. Bundrick, by contrast, should be afforded leniency.

**I.    Background**

Ms. Bundrick's story began 38 years ago in the same Washington Heights neighborhood where the incidents in this case took place. And from the moment she was born, she seemingly faced never-ending obstacles. The first of these obstacles came when she tested positive for cocaine shortly after coming out of her mother's womb due to her mom using the drug prior to her birth. It is unclear what direct impact this had on Ms. Bundrick's later development, but studies show that cocaine exposure during pregnancy can cause significant nervous system problems for children, such as difficulty with self-control, delays in learning, trouble processing emotions, and an increased need for special education in school.[4] It was thus no surprise when Ms. Bundrick, unlike her four siblings, was later diagnosed with a severe learning disability.

To that point, Ms. Bundrick began to miss several developmental markers very early on in life. Compared to her peers, she struggled to keep up with the pace of her classes, which led to her being held back multiple times. As she grew older, Ms. Bundrick's mother sought help from the Kennedy Children's Center, where she was first diagnosed with a learning disability. Fortunately, there are records documenting Ms. Bundrick's disability dating back to when was just a child.

According to an educational assessment from July of 2002, when Ms. Bundrick was 15 years old, her reading, math, and writing scores demonstrated that her abilities were the equivalent of a

---

[2] *See* Exhibit 1 (Elisa Bundrick (Sister) Letter) ("Tabitha is deeply remorseful for what happened. She never meant to hurt anyone. She is a kind, gentle person who has struggled to navigate a world that hasn't always been kind to her. She once dreamed of becoming a nurse so she could help others, but her intellectual disabilities kept her from pursuing that path. Despite her challenges, she has always tried to be good-hearted and brave.").

[3] *See* Exhibit 1 (Elias Bundrick (Son) Letter) ("She made mistakes, and I know she accepts full responsibility for what she did. But she is not a bad person. She is a loving, generous, and kind woman who has faced hardship and pain for most of her life. When she was a child, she was diagnosed with borderline intellectual functioning, but she never received the support she needed. Later in life, she ended up in a harmful, abusive relationship with a man who introduced her to drugs, used her, and stole from her. That's how she got lost in addiction — but she never stopped being the woman who loved and cared for me the best she could.").

[4] https://www.ncbi.nlm.nih.gov/books/NBK582649/

7- to 9-year-old child. *See* Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 8. This placed her in the very low range of scores for all three categories. *Id.* at 8-9. For context, whereas the average individual in her age range performed basic reading skills tasks and calculation tasks with 90% success, Ms. Bundrick was performing these tasks at a 4% and 2% success rate respectively. *Id.* Her IQ scores provide even greater insight. Based on an IQ test administered in 2005, she scored a 70, which is at the very low end of the borderline delayed range (i.e., 70 – 79). *Id.* at 9. The average score is 100, and thus, Ms. Bundrick fell more than two standard deviations below that. *Id.* Notably, the next descriptor below hers (i.e., Under 70) is what is now called extremely low, and previously was referred to as "mental retardation." *Id.* In short, there is a long, documented history of Ms. Bundrick having an intellectual disability.

Unfortunately, Ms. Bundrick's intellectual functioning has not improved with age, and has instead slightly declined due to her rampant drug use in recent years. *See id.* at 14. By age 19, Ms. Bundrick had only progressed to the 9th grade before dropping out of high school. And during a recent psychological evaluation in 2024, where Dr. Rachel Golden administered a Test of Nonverbal Intelligence (TONI-4), Ms. Bundrick scored in the less than 1 percentile, placing her in the range of a 6-year-old child. *Id.* at 13. Although there are no concerns about Ms. Bundrick's competency with respect to these criminal proceedings, consistent with undersigned counsel's experience, Dr. Golden concluded that Ms. Bundrick "is truly in need of tremendous assistance in understanding conversations, absorbing information, and reasoning through decisions." *Id.* at pg. 9. All of this therefore undercuts any suggestion that Ms. Bundrick is a calculated killer who intentionally targeted unsuspecting men.

When asked about her upbringing, Ms. Bundrick described it as simply "surviving." This was an accurate statement for several reasons that came to light in the lead up to her presentence interview. Throughout her lifetime, she has had to deal with, amongst other things, the electricity being cut off in her home due to unpaid bills, watching her mom get beaten to a pulp by her stepfather as she and her siblings tried to intervene, and being called stupid by her peers due to her learning disability. Most impactful, however, was when she revealed that she was sexually abused beginning around the age of 5 when she would stay with family in the Dominican Republic. Ms. Bundrick has explicit memories of two adult males, whom she knew as "uncles," forcing her to perform oral sex on them. They would also kiss and touch her genitalia, and sometimes force their penises inside of her. Ms. Bundrick took all of this abuse in silence, worried that her family would think she was merely seeking attention. The irony of this, however, is that she did need their attention.

We may never fully know the effect that years of sexual abuse had on Ms. Bundrick's psyche, but one thing that she has been able to unpack after years of reflection is that these experiences activated sexual desires in her at much too young of an age, and likely led her to view her body as a tool, as opposed to something that should be valued and protected. With this context, it is not difficult to see how she was later manipulated into being pimped out for money.

This dark chapter in Ms. Bundrick's life began when she was just 16 years old. At the time, she was dating a guy whose mother made her living as a prostitute. And one day, this woman approached Ms. Bundrick about doing the same. She enticed Ms. Bundrick by showing her all of the items she would soon be able to afford, such as new shoes. As someone who grew up in

3

poverty, and was taught that, because of her disability, she did not have the capability to hold a job, Ms. Bundrick recalls this feeling like an opportunity to finally show her mom she could "contribute [to the household] and provide for herself." To this last point, Ms. Bundrick has never held a long-term job in her entire life, instead supporting herself through Social Security Disability Insurance:

> Ms. Bundrick reported that she has never been able to find employment. She stated that she tried to apply for jobs a few times, but was never called back. She notes that she wishes that she could get a job, but that it is hard with no experience and when she struggles so much to understand language. She receives SSI, but states that a job would make her feel useful. Her ideal job is one that does not involve much reading. When asked, she indicated that she would like to be a waitress, or to help her mother around the house. A job as a waitress would likely be a job that would be too challenging for her, as her mother states that she struggles to complete tasks, especially when they involve multiple steps. For example, taking and entering food orders, maintaining a food safe environment, and managing multiple customers' needs at once would likely be too challenging.

Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 10.

  Shortly after being approached by her boyfriend's mother, Ms. Bundrick found herself out strolling the streets, selling her body to much older men. And her boyfriend's mother became her pimp. Indeed, whenever she would sleep with one of these men, they would pay her boyfriend's mother an upfront fee, leaving Ms. Bundrick with the leftovers. Ms. Bundrick has vivid memories of feeling disgusted because she was letting much older men whom she did not like penetrate her body sexually. At the same time, she felt good because she was finally able afford shoes and other clothing items, as well as be less reliant on her mother for support. This confusing dichotomy has left Ms. Bundrick trapped in a lifestyle that she never chose for herself. It is a lifestyle that still has hold over her to this day.

  It is with this context that Ms. Bundrick, at age 38, now finds herself behind bars for the first time in her life. She was not running around Washington Heights intentionally targeting men that she could kill and rob. Rather, she was doing the only thing she knew how to do to support herself financially -- prostitute her body. Over time, she was introduced to hard drugs, including cocaine, crack, K2, fentanyl, heroin, ecstasy, and Xanax. And these became the numbing agents that she would regularly use -- and share -- to get her through these sexual encounters. She was even using while pregnant with her son. *See* Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 6 ("Ms. Bundrick has one son, Elias, whom she gave birth to at 17 years old and who lives with her mother. Both Elias and Ms. Bundrick tested positive for substances after his birth. Her mother gained custody of Elias shortly after his birth, as it became apparent Ms. Bundrick was unable to care for him on her own."). Ms. Bundrick has been sick for so long. What she does not need is to spend more than a decade behind bars. Rather, as Dr. Rachel Golden outlines in her psychological report, Ms. Bundrick needs intensive substance abuse and mental health treatment:

> [I]t is my recommendation that Ms. Bundrick receive substance abuse treatment, substantial social supports and scaffolding, vocational training, and specialized, trauma-

informed mental health care for those with intellectual disability to appropriately treat and manage her C-PTSD, anxiety and depression.

*See* Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 5.

Unexpectedly, Ms. Bundrick views her arrest back in March 2024 as one of the bigger blessings in her life, as it likely saved her from her own impending death. As she recognizes, she could have easily been the one who overdosed on drugs during her sexual encounters. While she is heartbroken to be separated from her family, this was the intervention that she needed to finally get clean from drugs. On the date of her sentencing, the one year and four months that she has been in custody will be the longest period she has been off of drugs since she first started using.

In addition to being clean from drugs, Ms. Bundrick's time in custody has helped her build confidence in her ability to, despite her learning disability, accomplish more than being a prostitute. One of the things she is most proud of are the eighteen (and counting) educational courses that she has completed and obtained certificates for while at the MDC. *See* Exhibit 3 (Certificates of Completion). She is also finding her voice and learning to advocate for herself. One example of this is that she reported an MDC officer who made derogatory comments towards her and made insinuations about her weight gain. This officer was later moved to a different unit.

Ms. Bundrick has made the most of her time in custody and has spent this past year and four months reflecting on the impact of her conduct and setting goals for herself moving forward. And with the help of a fellow inmate from her unit that she befriended, she was able to put those insights into words for the Court to read:

> In this letter, I would like to begin with my feelings of remorse for the family. I take responsibility for my actions and truly regret all my poor choices. I think of the family everyday and how they lost a loved family member. I know nothing can bring him back but I am sorry for the tragedy that occurred and for the pain they are experiencing. Since being incarcerated I have been focusing on improving myself everyday. I have taken every class offered to me and received numerous certificates for completing them. Through these classes and therapy, I can now engage in consequential thinking and identify how my actions and behaviors affect others. Due to my history of trauma and substance abuse, I realize that my life could have been taken as well. Since being incarcerated I have remained sober which is something I've never accomplished. I vow to continue to remain sober, as I know how great an impact it can have on my life and others. I would value the opportunity to be a mother to my son who is diagnosed with ADHD as well as requires anger management. I'd also value the opportunity to be a better sister and daughter. I have goals to get my GED, volunteer and gain employment helping people or working with my mom and siblings in a hospital. I have learned from my mistakes and would appreciate leniency on my sentence. I feel I deserve a second chance and that I could be a productive member of society. Thank you for your time.

*See* Exhibit 1 (Tabitha Bundrick Letter Pt. 1). These are not the words of a serial killer, or someone who lacks remorse for the role she played in the overdose deaths of several men. To the contrary, these are the words of a woman who has seen and lived the impact of drug addiction, who takes

responsibility for her actions, and who wants to better herself and stay clean moving forward. She just asks the Court to be able to do that from the outside world sooner rather than later.

## II.    Offense Conduct

The offense conduct in this case involves the unfortunate deaths of three men due to drug overdoses.[5] Count One involved the death of a 42-year-old man (Victim 1) on April 30, 2023, in which his autopsy found the cause of death was acute intoxication by the combined effects of fentanyl and ethanol. And Count Two involved the death of a 34-year-old man (Victim 2) on February 25, 2024, in which his autopsy found that cause of death was acute intoxication by the combined effects of fentanyl, acetylfentanyl, and fluorofentanyl. Ms. Bundrick pled guilty to possessing and distributing the fentanyl that caused the death of each victim.

### Count One:

On April 30, 2023, Ms. Bundrick encountered two men -- Victim 1 and his brother-in-law -- outside a laundromat in Washington Heights. During this encounter, the three parties agreed to go to a nearby vacant apartment, where the two men would pay Ms. Bundrick for sex. Neither man was forced into this agreement.

Once at the apartment, as she had done on numerous occasions before that, Ms. Bundrick ingested drugs in preparation for her sexual encounter. She also shared her drugs with the two men, who willingly took part before each of them had sex with her. That night, three consenting adults shared the same drugs, from the same source, at the same vacant apartment. All three adults, including Ms. Bundrick, eventually passed out. And tragically, two of these adults (Ms. Bundrick and Victim 1's brother-in-law) woke up the next morning, while Victim 1 unfortunately did not.

Importantly, there is no suggestion that Ms. Bundrick knew Victim 1 had passed away at the time of death. Indeed, not even Victim 1's brother-in-law realized Victim 1 had died before leaving the apartment the next morning to go find help. *See* Dkt. 27 (Presentence Report) at ¶ 16 ("Shortly after waking up, Victim-2 found Victim-1 unresponsive on the floor of the vacant apartment. Victim-2 thought Victim-1 was asleep, so he tried waking him. After Victim-1 did not wake up, and Victim-2 was unable to move Victim-1, Victim-2 left the apartment to look for help, ultimately finding Victim-1's family, who lived nearby, and then Victim-1's family called the police.").

Setting aside the tragedy of this situation, one thing that is clear is that this is not a case where a drug dealer or supplier is being held responsible for the deaths of their customers. To the contrary, the supplier from whom Ms. Bundrick purchased her personal use drugs is likely still out there poisoning the community. This incident instead is strictly about a woman who prostituted her body to support herself, and before having sex with two adult men, shared her personal drugs with them. The government will try to paint Ms. Bundrick as a criminal mastermind who targets unsuspecting men on the street and then intentionally drugs them for her own gain. But this

---

[5] Ms. Bundrick was not charged with causing a third death. However, pursuant to her plea agreement, she has agreed not to contest that she is responsible for the death of victim three, who died of a drug overdose on September 30, 2023.

narrative could not be further from the truth.

### Count Two:

In the early morning hours of February 25, 2024, Ms. Bundrick encountered a man walking down the street in Washington Heights. The two struck up a conversation, and the man invited Ms. Bundrick back to his apartment, where the two of them planned to get high together. Once there, they shared drugs that Ms. Bundrick had in her possession. Victim 2's roommate found him later that day unresponsive. It was thereafter determined that Victim 2 had died from a drug overdose.[6]

Ms. Bundrick is extremely remorseful for contributing to the deaths of these men. While she never had any intention to harm them, she accepts responsibility for the role that she played, and understands that she must still be held accountable regardless of her intentions:

> I want to express my sincerest apologies to you, the courts, the government and everyone else who has been affected by my actions. I deeply regret what I have done and fully accept accountability for my involvement in this case. I understand the seriousness and harm of my actions. I'm truly sorry for the terrible decisions I made. My life changed in a negative way when I moved out of my mom's house when I was controlled by my addiction and fear. . . . I recognize that there's no excuse that can make up for what I did and I'm here today because I know I must face the consequences of my actions. I just want you to know that this was never the life I envisioned for myself. I deeply regret every decision I made and I'm determined to use this experience as a turning point.

*See* Exhibit 1 (Tabitha Bundrick Letter Pt. 2).

### III. The Court has the Discretion to Impose a Below Guidelines Sentence

"A sentencing judge has very wide latitude to decide the proper degree of punishment of an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). In exercising its discretion, courts must be "mindful of the fact that the Sentencing Guidelines are just that, guidelines, and that they are truly advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (internal quotations and citation omitted). Moreover, the Second Circuit has "declined to adopt a presumption of reasonableness for sentences that fall within the guidelines range." *Id.* (citation omitted). Instead, the Second Circuit has championed "a more flexible approach that allows considerations of the facts of an individual case." *Id.* Ultimately, courts are to use as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary to comply with the factors set out in 18 U.S.C. § 3553(a)(2)" – proportionality, deterrence, incapacitation, and rehabilitation. *Id.* (internal quotations and citation omitted). Stated differently, the Court must "consider every convicted person as an individual" and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

---

[6] There is evidence that Ms. Bundrick took several items from Victim 2's apartment when she left. That is the subject of a parallel state court proceeding where Ms. Bundrick is charged with burglary.

While this Court is not bound by the parties' plea agreement and can thus impose any sentence that it deems appropriate, the terms of the plea agreement prevent Ms. Bundrick from requesting or suggesting that the Court should impose a sentence that is less than 120 months. Nevertheless, she is permitted to ask the Court explicitly to impose a sentence below her calculated Guidelines range of 168 to 210 months, and one that does not exceed 10 years. She respectfully makes that request here.

### IV.    The § 3553(a) Factors Support a Sentence of No Greater than 10 Years

In recommending a sentence of 144 months, probation recognizes that there are mitigating factors warranting a downward variance in this case. Respectfully, however, Ms. Bundrick does not believe probation's downward variance goes far enough, as the § 3553(a) factors support a sentence of no greater than 10 years.

Beginning first with the nature and circumstance of the offense, it is important to remember that Ms. Bundrick, unlike the typical defendant in death resulting cases, is not alleged to be a dealer or supplier of drugs. Rather, she shared the drugs that she had acquired for her own personal use with others. The true source of those drugs is, in all likelihood, still out there dealing to others in the Washington Heights community.

While under the letter of the law, Ms. Bundrick's actions in sharing her personal use drugs with others is considered distribution, the dividing line between criminal conduct and non-criminal conduct is extremely thin. Indeed, had Mr. Bundrick and the victims purchased the drugs together from a dealer and then shared them, she could not be held criminally responsible under 21 U.S.C. § 841. *See United States v. Wallace*, 532 F.3d 126, 130 (2d Cir. 2008) ("[W]here two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse-simple joint possession, without any intent to distribute the drug further."). The only reason she is liable is thus because she purchased the drugs on her own before sharing them. This is largely a distinction without justification that does not warrant a sentence beyond 10 years.

Turning next to the history and characteristics of Ms. Bundrick, at 38 years old, this is her first ever criminal conviction, and thus, there is no evidence that an overtly punitive sentence is necessary as a course-correcting measure. Moreover, Ms. Bundrick is not a drug dealer; rather, this offense was borne by the combination of Ms. Bundrick's cognitive limitations, her sexualization and introduction to prostitution at an early age, and a longstanding drug addiction that has carried her through it all.

As discussed at length above, Ms. Bundrick has a long, documented history of a learning disability that has capped her intellectual functioning at a third-grade level. And in a recent evaluation by Dr. Rachel Golden, she was found to meet the clinical criteria for Intellectual Disability, Moderate. *See* Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 2. This is a notable finding for several reasons. First, Dr. Golden notes that individuals with intellectual disabilities are more susceptible to maltreatment. *See id.* at 15 ("There is a well-established correlation between [Intellectual Disability] and vulnerability to maltreatment and coercion.

Impairments in social and occupational functioning and a greater reliance on others for decision-making create vulnerability to coercion and mistreatment. . . . In Ms. Bundrick's case, ID has likely made her more vulnerable to maltreatment and coercion because she has a limited ability to care for herself and has had to rely on individuals willing to help her.") (citations omitted). In Ms. Bundrick's case, this likely played out through her being sexually abused by relatives and being pimped out at the age of 16 by her boyfriend's mother. Second, connecting the dots even further, Dr. Golden goes on to note that intellectual disabilities have also been found to make individuals more susceptible to problematic drug use, and because "Ms. Bundrick's cognitive impairment has been clearly documented since she was in elementary school and her substance use disorder began around age 17, it is likely that her intellectual disability made her more vulnerable to coercion resulting in misuse of substances." *Id.* at pg. 15-16. Relatedly, Dr. Golden notes that exposure to trauma can make individuals more susceptible to substance use disorders. *Id.* at 16. For example, studies show that "women with a history of childhood sexual abuse are more likely to use illegal substances as a means of self-medicating distress associated with trauma." *Id.*

Summing this all up, Ms. Bundrick's intellectual disability made her more susceptible to sexual abuse and exploitation, and both of these things made her more susceptible to drug use and addiction. When you consider the fact that part of the reason Ms. Bundrick continued to engage in prostitution was to fund her drug addiction, drugs in which she then turned around and used to numb herself through those sexual encounters, you realize that she has been trapped in a cycle, with her intellectual disability, sexual trauma, and drug addiction all inexplicably linked together. Furthermore, you realize that the men who tragically overdosed in this case were merely unintended victims who were swept up in Ms. Bundrick's spiral of self-destruction. This does not excuse Ms. Bundrick's actions in this case of sharing her personal use drugs with others, but it does provide necessary, scientific context, and undercuts any suggestion that a sentence beyond 10 years is appropriate.

When looking at the need for the sentence imposed, these factors too support a sentence of no greater than 10 years. First, in terms of providing just punishment for Ms. Bundrick's offense, it is notable that Ms. Bundrick has not been receiving federal custody credit for the year and four months that she has been at the MDC. That is because she is still in state primary custody in connection with a burglary charge related to Count Two of this federal case. In other words, all of the time that she has been at the MDC may ultimately count for nothing in this federal case. Moreover, irrespective of what sentence this Court imposes, it is entirely possible that she will face additional time in the state. Under these circumstances, sentencing her to a period of incarceration beyond 10 years would not constitute a just punishment; rather, it would represent one that is far greater than necessary

Second, in terms of general and specific deterrence, there is little to be gained by imposing a sentence in excess of 10 years for a non-violent, first-time offender; particularly, where there is no evidence that Ms. Bundrick would be unamenable to changing her behavior in the future. General deterrence, as a threshold matter, is "a phenomenon that is notoriously difficult (and perhaps) impossible to measure." *See United States v. Brady*, 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Indeed, the very idea of general deterrence is premised on the erroneous idea that would-be offenders can anticipate what punishment they might receive. But as we know, "[since] consequences for the same federal offense vary widely from one judge to the next, deterrence is

undermined because a defendant who comes up for sentencing has no way of knowing or reliably predicting whether he will walk out of the courtroom on probation, or be locked up for a term of years that may consume the rest of his life, or something in between." *See United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring in part) (internal quotations and citation omitted). It is for this very reason that individuals who come before the Court are warned that no one can reliably predict what their sentence will ultimately be.

Consistent with the above, the Vera Institute of Justice has found that more severe sentences do not deter crime:

> The concept of deterrence seems intuitive: if punishments are more severe, people will stop committing crimes because the consequences are so dire. Deterrence theory was part of the rationale for lengthening and increasing the surety of sentences to incarceration through the expansion of mandatory minimums in the 1980s and 1990s. Study after study, though, has shown that people do not order their unlawful behavior around the *harshness* of sentences they may face, but around their perceived likelihood of being caught and facing *any* sentence. First, the general public's knowledge of, or even an individual's familiarity with, the specific criminal sanctions set by legislatures is often limited at best. Second, most people are deterred from engaging in unlawful behavior not because they fear a particular sanction but simply because they know the behavior is prohibited. A 2013 meta-analysis of studies on deterrence concluded that "it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime-prevention basis."

*See* Exhibit 4 (Vera Institute Sentencing Report) at pg. 23. Sentencing Ms. Bundrick to a term of imprisonment above 10 years under the guise of deterrence would thus not have the impact that the Court intends.

Third, in considering the need to protect the public, it is not Ms. Bundrick who this Court ultimately needs to worry about; rather, it is the dealers and suppliers who fed her drug addiction, and who continue to feed the Washington Heights community with narcotics. Ms. Bundrick shared her personal use drugs with others. And while she is rightly being held responsible for that action, which led to the death of several individuals, there are hundreds of other drug users in that community who continue to share their drugs with others and overdose unexpectedly each day. To that point, last year, in New York City alone, there were over 3,000 drug overdose deaths.[7] Ms. Bundrick should be held responsible for her contribution to that number, but she should not be treated as if she was a dealer or supplier of those illegal narcotics.

Fourth, with respect to providing Ms. Bundrick with education or other correctional treatment, there can be no argument that she will have more access to needed treatment resources behind bars than she would have out in the community. Ms. Bundrick's needs are extremely layered, as she has been diagnosed with an Intellectual Disability, Opiod Use Disorder, Cocaine Use Disorder, Post Traumatic Stress Disorder, and an Anxiety Disorder. Accordingly, Dr. Rachel Golden has recommended a multifaceted approach when it comes to offering Ms. Bundrick much needed rehabilitation:

---

[7] https://oasas.ny.gov/overdose-death-dashboard

> Given this presentation, it is my recommendation that Ms. Bundrick receive substance use treatment, substantial social supports and scaffolding, vocational training, and specialized, trauma-informed mental health care for those with intellectual disability to appropriately treat and manage her C-PTSD, anxiety and depression.
>
> As there is no medication that directly treats PTSD symptoms, Ms. Bundrick should receive developmentally appropriate mental health care that treats trauma directly, such as Cognitive Processing Therapy (CPT), Eye Movement Desensitization and Reprogramming (EMDR), or Prolonged Exposure (PE). Ms. Bundrick should also receive mental health treatment targeted at addressing anxiety and depression. Cognitive Behavior Therapy (CBT) is the most appropriate fit for treatment of these symptoms. It is possible that, with therapy, Ms. Bundrick's C-PTSD, depression and anxiety symptoms may be improved.
>
> Ms. Bundrick should also gain access to developmentally appropriate substance use treatment such as Dialectical Behavior Therapy (DBT).
>
> Each of the treatment modalities outlined above are suitable for people of varying ages and intellectual abilities. With the proper modifications, these modalities can be accessible and effective for someone with an Intellectual Disability like Ms. Bundrick. Appropriate modifications will require a psychotherapist well-versed in Intellectual Disability to explain the concepts and skills taught in these therapies at Ms. Bundrick's intellectual level. These modifications will ensure that the information would be understandable and meaningful to her. Ms. Bundrick may also need more time than typically allotted to complete each of these therapeutic modalities. For example, in order to adapt CBT intervention for Ms. Bundrick, she should receive materials and instruction that is modified for her level of comprehension and that goes at her pace. This may mean that she will need extra time to effectively learn and implement the concepts.
>
> To best cope with her intellectual disability, Ms. Bundrick could benefit from interventions to improve her activities of daily living such as, personal hygiene, managing her healthcare, timeliness, etc. Support in these areas would increase her independence and ability to successfully complete daily tasks. Most importantly, such support would be very likely to improve her self-esteem and reduce worry, thus improving depression and anxiety symptoms.

*See* Exhibit 2 (Dr. Rachel Golden Psychological Evaluation) at pg. 5.

In addition to the above treatment recommendations, the Social Work Department at undersigned counsel's office has worked with Ms. Bundrick throughout this case and has provided her with resources that she can obtain once she is released from custody. *See* Exhibit 5 (Social Work Re-Entry Plan). When you consider the fact that Ms. Bundrick will also be under the supervision of the probation department, she will, for the first time in her life, receive the community support that she needs to navigate this difficult world.

Finally, the conditions of confinement that Ms. Bundrick has faced over the last year and

11

four months at the MDC warrant consideration in fashioning an appropriate sentence. The Court, by this point, is well aware of the horrific conditions that she has endured. *See, e.g.*, *United States v. Morgan*, 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020), Doc. 90, Tr. 12:25-15:21 (Judge Berman describing MDC Brooklyn as "terrible, "dirty," and a "seriously deficient system at core"). *United States v. Days*, 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), Doc. 35, Tr. 19:5-13 ("The single thing in the five years that I was chief judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC, especially at the MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done."). And it is widely accepted within this District that excessively punitive conditions of pre-sentence detention can warrant a downward variance. *See United States v. Phillibert*, 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in arduous conditions merited recognition by courts in measuring a just sentence.") (citing *United States v. Carty*, 264 F.3d 191, 196-97 (2d Cir. 2001) (holding that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures). In fact, one judge in this District has opined that being incarcerated at the MDC is the equivalent of serving time and a half to two times an ordinary sentence:

> Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh. Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been. As defense counsel points, he has already served the equivalent of 28 months if you factor in good-time credit. Now, that is significantly below the guidelines, but I think that's a long period of time. I think that is sufficient but not greater than necessary to serve the purposes of sentencing in terms of all the factors I have mentioned.

*United States v. Gonzalez*, 18-CR-669 (JPO) (S.D.N.Y. Apr. 2, 2021) Doc. 250, Tr. 17:17-18:9.

While efforts have been made to improve the conditions at the MDC, those efforts have still fallen short of what should be expected from a BOP facility. Among the terrible conditions that judges have highlighted include the constant lockdowns which are tantamount to solitary confinement, ignored medical orders, and an inhumane housing environment that exposes inmates to visible mold, contaminated drinking water, and vermin infestation. *See United States v. Chavez*, Case No. 22-CR-0303-JMF (S.D.N.Y.), Dkt. 31 at 9-12. This does not even account for the severe safety issues at the facility, which has seen two recent murders, a total of nine inmates charged in connection with those incidents,[8] and a complete interagency law enforcement sweep to rid the

---

[8] https://apnews.com/article/federal-jail-brooklyn-diddy-bureau-of-prisons-afd6aebdfacd70286955f8c1bbf1cd6e

MDC of all illegal contraband and weapons.[9]  These conditions would be difficult to navigate for any individual at the MDC.  But these conditions are particularly challenging for Ms. Bundrick, who is doing so with a learning disability and other significant mental health diagnoses0, including Post Traumatic Stress Disorder and Anxiety Disorder.

In short, the § 3553(a) factors weigh in favor of a sentence of no greater than 10 years.  Ms. Bundrick is before the Court for her first ever criminal conviction, and with the proper education, job support, and drug and mental health treatment, she poses little risk of recidivism.  For the first time in her life, Ms. Bundrick will have access to re-entry professionals who can support her as she unpacks decades of trauma and works to undo years of substance abuse.  As she wrote in her letter to the Court:

> I really want to live a crime free life, have a community of people who will help me to stay on a safe and healthy path.  With your mercy, I hope to have another opportunity to truly recover, get treatment for my addiction and mental health issues and rebuild my life so I never return to this destructive path again.

*See* Exhibit 1 (Tabitha Bundrick Letter Pt. 2).  Ms. Bundrick desires the help to turn her life around, and this Court has the power to give her that help.  She just asks that she be able to take advantage of these resources sooner rather than later.

## V.     Conclusion

For all of the reasons stated herein, Ms. Bundrick respectfully asks the Court to impose a sentence of no greater than 10 years.  Moreover, as recommended by the probation office, she requests that any sentence imposed be ordered to run concurrent to any sentence imposed in her New York County Supreme Court case (IND-71062-24/001).  *See Stetser v. United States*, 566 U.S. 231, 236-37 (2012) ("Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings.  And a large majority of the federal appellate courts addressing the question have recognized a similar authority in the context here, where a federal judge anticipates a state sentence that has not yet been imposed.  We find nothing in the Sentencing Reform Act, or in any other provision of law, to show that Congress foreclosed the exercise of district courts sentencing discretion in these circumstances."); U.S.S.G. §5G1.3(d) ("In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.").

---

[9] https://www.nytimes.com/2024/10/28/nyregion/doj-mdc-brooklyn-prison.html

13

Respectfully Submitted,
/s/
Kristoff I. Williams
Assistant Federal Defender
Federal Defenders of New York
(212) 417-8791

14